IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


ANTHONY HICKS                                                                                    PLAINTIFF


          v.                              Civil No. 1:06-cv-01086


DAVID NORWOOD, Captain,
Ouachita County Jail; LT. GREGORY
Ouachita County Jail; and
SGT. BAKER, Ouachita County Jail                                                        DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Anthony Hicks (hereinafter Hicks) filed this civil rights action pursuant to 42 U.S.C. § 1983.

Hicks contends his constitutional rights were violated while he was incarcerated at the Ouachita

County Detention Center in Camden, Arkansas.  Specifically, he contends excessive force was used

against him by Captain David Norwood.  Further, he maintains Lt. Gregory and Sgt. Baker, although

present at the time of the use of force, did nothing to prevent the use of excessive force.  Pursuant to

the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Harry F. Barnes, United States

District Judge, referred this case to the undersigned for the purpose of making a report and

recommendation.

Defendants filed a motion for summary judgment (Doc. 29).  Hicks filed a response to the

motion (Doc. 62).

## I. Background

On December 30, 2005, Hicks was arrested by Officer Ferguson of the Camden Police

Department.  *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 1 at page 7.  He was initially taken to the

Camden Police Department.  *Id.* at page 14.

According to Hicks, Camden Police Officer Scott Wells became angry with him when he

wouldn't sign a Miranda rights form and wanted to wait until he had an attorney. *Plff's Ex.* 1 at page

12-13.  As a result, Wells put Hicks in handcuffs, ran him against the wall, turned him around, and

hit him in the stomach and on the back of the head.  *Id.*  Hicks maintains when they attempted to take

pictures to book him in he was still bent over from Wells hitting him in the stomach.  *Id.* at page 16.

As a result they, put down that he refused to cooperate.  *Id.*

According to a January 3, 2005, memorandum written by Wells, he attempted to conduct an

interview with Hicks on December 30, 2005.  *Defendants' Exhibit* (hereinafter *Defts' Ex.*) 2 at page

8.  During the personal data portion of the interview, Wells wrote that Hicks refused to provide Wells

with information such as the name of his parents, his address, and his age.  *Id.*  When Wells

attempted to read Hicks the rights form and have Hicks sign it, Wells reported Hicks became

belligerent, used profanity, and made racial comments.  *Id.*

Wells indicated he was attempting to interview Hicks about an active warrant on a rape

charge.  *Defts' Ex.* 2 at page 8.  When Hicks refused to sign the rights form, he stood up.  *Id.*  Wells

told Hicks to sit.  *Id.*  Hicks refused.  *Id.*  Hicks then kicked his chair against the wall and asked if

Wells was going to "beat his a–."  Wells told Hicks to sit and attempted to walk around his desk.  *Id.*

Hicks then struck Wells in the right temple when he wasn't looking.  *Id.*

Wells grabbed Hicks in bear hug and the two of them struck the wall.  *Defts' Ex.* 2 at page

8.  Hicks then relaxed and Wells attempted to cuff him.  *Id.*  As soon as Wells cuffed Hicks' left arm,

Hicks began struggling with Wells.  *Id.*  The two of them were knocking into furniture and hitting

the walls.  *Id.* at page 9.  Wells got his left arm around Hicks' neck and tried to bring right arm back

to cuff him.  *Id.*  Wells pushed Hicks toward the wall.  *Id.*

Hicks threatened to sue Wells and his department.  *Defts' Ex.* 2 at page 9.  Hicks began saying

Wells had struck him while he was handcuffed and how he had been victimized.  *Id.*  The entire time

Hicks was being booked at the Camden Police Department he continued cursing Wells, threatening

him, and using racial slurs directed at Wells.  *Id.*

Hicks was then taken to the Ouachita County Detention Center (OCDC) to be booked in.

*Defts' Ex.* 1 at page 1.  The intake officer was Sgt. David Baker.  *Id.*  Baker testified Hicks would not

give him any information to confirm that the information he had was current and correct.  *Plff's Ex.*

3 at page 8.  All Hicks would say was:  "You already know who I am, and things to that effect."  *Id.*

Baker then told Hicks that he was going to get dressed out and go up to an isolation cell and

that the booking procedure would be completed when he calmed down.  *Plff's Ex.* 3 at page 11.

According to Baker, he had some uniforms big enough for Hicks but they were black and white

striped.  *Id.*  Hicks preferred orange and the biggest ones Baker had in orange were a 2X and Hicks

needed a 3 or 4 because he wanted to be comfortable.  *Id.*  Hicks said he wasn't putting any of them

on.  *Id.* at page 14.  Hicks cursed Baker, called him a bitch and other derogatory names.  *Id.* at page

19.

Baker saw Defendant Norwood come into the intake area, Hicks jump up from the bench,

Norwood pushed him back down onto the bench to sit him down, and Hicks jumped right back up.

*Plff's Ex.* 3 at page 19.  At that point, Norwood grabbed his left arm and turned it around as he was

putting his hand on the back of Hicks' neck or the back of his shoulders.  *Id.* at page 20.  At this

point, Hicks started trying to push with his stocking covered feet on a waxed floor.  *Id.*  Hicks fell

hitting the fingerprint table and ended up on the concrete floor.  *Id.* at pages 32-33.

Baker testified that when Hicks jumped at Norwood he was attempting to assault him.  *Plff's*

*Ex.* 3 at page 39.  In Baker's opinion, Norwood was using a minimal amount of force in attempting

to take Hicks to the floor.  *Id.* at page 46.  Baker testified that Hicks was "not thrown to the table. The table just got in the way."  *Id.* at page 48.

When Baker asked him for his name and address and other information, Hicks states he told him:  "Man, you got it on the computer.  Look it up.  I done been before."  *Plff's Ex.* 1 at page 18. Hicks also states the uniform pants he was given were too small.  *Id.* at page 19.  He told Baker they were too little and he wasn't putting them on.  *Id.*

As the foregoing was occurring, Lt. Cedric Gregory made a call to the jail for something totally unrelated when he heard raised voices in the background.  *Plff's Ex.* 4 at page 9.  He asked Baker what was going on.  *Id.*  Baker replied he was having problems with a subject he was trying to book in and asked Gregory to report to the jail.  *Id.*

Gregory wrote the following narrative report regarding what occurred following his arrival at the jail:

> [Hicks] was very belligerent and extremely loud.  He repeatedly cursed officers and refused to do what was asked of him.  It was decided that Hicks would be placed in a cell and the booking procedure completed later.  Captain Norwood reported to the jail and was advised of the situation.  Captain Norwood instructed Hicks to put on the uniform and he refused.  Hicks was again instructed to put on the uniform.  At this point Hicks jumped up from the bench where he was seated and stated he was not going to put the uniform on "because this shit is to[o] small."  He threw the uniform pants onto the floor, grabbed his personal trousers and attempted to put them on. Captain Norwood grabbed the pants and took them away.  He informed Hicks that he could not wear his personal clothing in the jail.  At this point Hicks thrust his chest forward and bumped into the Captain Norwood stating "bitch, you don't know who you f------ with."  Captain Norwood pushed Hicks away and Hicks stumbled and fell striking his face on the fingerprint table as he went down.  Hicks then launched into a verbal tirade stating to Captain Norwood "you f----- up my face," "you never should've done that you punk bitch cause I'll kill your whole family."  In the fall Hicks spit blood all over the floor and room.  Captain Norwood instructed Hicks to get up and put on the uniform so he could be taken to the hospital for treatment. Hicks continued to yell stating "f— you punk bitch, suck my dick.  You white mother f------ f----- with the wrong nigga.  I'll kill all you bitches.  Just wait till I get out." Hicks finally complied and put on the uniform pants but continued to yell profanities

-4-

at officers.  He was placed in restraints and transported to Ouachita County Medical Center for treatment of his injuries.

*Defts' Ex.* 2 at page 1.  *See also Plff's Ex.* 4 at pages 16-17 ("He began to stumble.  He was trying to re-catch his balance and he made impact with the fingerprint table, ma'am, which was some seven to eight feet away.").

Gregory testified that he believed it was appropriate for Norwood to use physical force to restrain Hicks.  *Plff's Ex.* 4 at page 28.  The speed with which Hicks got up from the bench coupled with the fact that he was headed directly toward Norwood made his action an aggressive maneuver.  *Id.*

Gregory testified he is familiar with the arm bar technique.  *Plff's Ex.* 4 at page 17.  He did see Norwood place his hand on Hicks and push him away and down.  *Id.*  Gregory could not see Norwood's other hand from where he was.  *Id.*  Norwood did not push Hicks to the floor.  *Id.*  As Norwood was pushing Hicks towards the floor, Hicks "lost his balance and began to stumble . . . he was trying to recapture his balance, and his momentum carried him over to where he struck the fingerprint table."  *Id.*  According to Gregory, it looked like Norwood lost his grip on Hicks' left arm.  *Id.* at pages 19-20 & 22.

According to Hicks, the following occurred:

> While I was sitting there, that's when Captain David Norwood came up and slapped me across the face and closed both of the doors to the booking area–to the cell block doors.  And I was like, "Man, why you slap —why did you do that?"  He swung around with an iron flashlight or whatever.  Something–some kind of device and hit me.  When I came to, I was trying to get up off the floor and I heard something shocking me when I tried to push myself up.  Stuff was stuck all in my hands.  At the time I didn't know what it was and then I realized it was my teeth.  And my shirt was bloody and he was steadily kicking me and stomping me.  And so I heard him kept saying, "I'm not old man Norwood."  . . .  So, Sergeant Baker and Lieutenant Gregory – they was just standing there looking, you know.  So, he told me to get up.  And they gave me – finally gave me clothes that was my size and told me he was going to carry

me to the hospital.  And I was steadily trying to spit teeth and stuff out of my mouth.

*Hicks Deposition* at page 19.

Hicks testified Norwood backhanded him on the left side of his face.  *Hicks Deposition* at

page 68.  Hicks believes he was being assaulted by Norwood for a "good 30 minutes."  *Id.* at page

20.  Hicks described the object used by Norwood as a long black object two feet to two and a half feet

long–a flashlight or a shocking device.  *Id.* at pages 25-26 & 28-29. When he woke up Hicks stated

Norwood was stomping him, kicking him, and shocking him with the device.  *Id.* at page 26.

Hicks believes the reference to "old man Norwood" was to another older detention center

employee by the name of Norwood who Hicks had an altercation with in 2003 or 2004.  *Hicks*

*Deposition* at page 22.  He was the transport officer taking inmates, including Hicks, to the Arkansas

Department of Correction.  *Id.*  The two had a verbal exchange and Hicks ended up throwing some

milk on the officer.  *Id.*  Hicks thought Norwood might be "kin to old man Norwood" and this might

be why Norwood assaulted him on December 30, 2005.  *Id.* at page 26.

With respect to Baker and Gregory, Hicks maintains they should have intervened and stopped

the assault by Norwood.  *Hicks Deposition* at page 62.  By not doing so, Hicks maintains they

condoned what Norwood was doing.  *Id.*

Hicks offers the affidavit of Eddie Bunn.  *Plff's Ex.* 7.  In the affidavit, Bunn states he and

other trustees were watching from a door when Norwood came in and struck Hicks with a open hand

across the face.  *Id.*  They were then ordered away from the door they had been standing in.  *Id.*

Norwood testified he became the jail administrator in 2004.  *Plff's Ex.* 2 at page 7.  Until

December 30, 2005, Norwood testified he never had a problem with Hicks.  *Id.* at page 9.  Norwood

testified that when he got into the hallway on the first floor, he could hear the screaming from the

second floor.  *Id.* at page 71.  When Norwood got upstairs there was a verbal altercation going on between Baker and Hicks.  *Id.* at pages 18-19.  Hicks was refusing to put on his uniform pants.  *Id.* at page 18.  He was going to put his street clothes back on.  *Id.* at page 19.

Norwood testified Hicks jumped right up in his face and was screaming something about clothing.  *Plff's Ex.* 2 at pages 21 & 48.  Norwood shoved Hicks back on the bench, grabbed his pants out of his hand, threw them on the bench,  and told him he was going to wear what was given to him, or he wouldn't wear anything.  *Id.* at pages 21-22.   At the time, Norwood testified he didn't know what the problem was he just knew it was out of hand.  *Id.* at page 21.  Norwood used his hand against Hicks' chest to shove him back on the bench.  *Id.* at page 22.

According to Norwood, Hicks jumped right back up and was screaming.  *Plff's Ex.* 2 at pages 24 & 49.  Norwood took this as an act of aggression and attempted to take Hicks to the floor.  *Id.* Norwood grabbed Hicks' left hand and the back of his neck, pulled his arm back, and tried to take him down chest first to the floor.  *Id.*  The purpose of the maneuver is to make the person off balance so you can take them to the floor.  *Id.* at page 27.  Hicks resisted and because of that as they went down Hicks' head hit the end of the booking table.  *Id.* at page 28-29.  If Hicks hadn't resisted, Norwood testified Hicks would have been on the floor a couple of feet from the booking table.  *Id.* at page 29.

Norwood did not have a flashlight on him.  *Plff's Ex.* 2 at page 72.  He did not have any other equipment on him.  *Id.*  Hicks apparently struck the fingerprint table with his mouth causing injury to his mouth and lip area.  *Id.*

Norwood testified he never knew Hicks went unconscious.  *Plff's Ex.* 2 at page 74.  Norwood understood that part of the problems that led to the extractions were caused because his face hit the

booking table. *Id.* at page 76.  Hicks did not make any verbal threats against Norwood until after this

happened.  *Plff's Ex.* 2 at page 76.

Hicks was treated at the Ouachita Medical Center on December 30, 2005.  *Defts' Ex.* 3 at

pages 9-10; *Plff's Ex.* 1 at pages 34-35.  He had lacerations to his upper (2.5 cm) and lower (1.0 cm)

lips.  *Id.* at pages 7 & 10.  X-rays were taken and his wounds cleaned with peroxide and betadine.

*Id.*  The lacerations on his upper and lower lip were sutured.  *Id.*; *Plff's Ex.* 1 at page 35.  It was noted

that Hicks lips were swollen, his tongue intact, and his teeth were not loose.  *Defts' Ex.* 3. at pages

9-10.  The x-ray of his jaw was normal (WNL–within normal limits).  *Id.*  There are no notations in

the hospital records about Hicks having any broken teeth.  *Id.  See also Plff's Ex.* 1 at page 34-35

(Records state my teeth are intact.  "I wonder how they could say that.").

It was also noted that Hicks was "hyper" and had an "ETOH" (Ethanol or Ethyl Alcohol)

odor.  *Defts' Ex.* 3 at page 7.  Hicks tolerated the sutures well and was discharged in good condition.

*Id.* at pages 7 & 10.  He was discharged with instructions that the sutures would slowly dissolve, he

was to be on a soft diet for three days, and he was to gargle four to five times daily with salt water.

*Id.*

When Hicks returned to the jail, he was placed in a single cell away from the jail population.

*Defts' Ex.* 2 at page 2; *Plff's Ex.* 1 at page 36.   Hicks remained in this cell for four or five days.

*Plff's Ex.* 1 at 56-61.  During this time, he testified he did not have phone access for four days

because they turned the phone off.  *Id.* at page 58.  The rest of the time he was at the OCDC he was

in general population and had the use of a phone.  *Id.* at page 60.

For about four or five days, Hicks also testified he did not have mail privileges.  *Plff's Ex.* 1

at page 61.  He indicates they wouldn't give him any paper or anything to write letters.  *Id.*  Hicks

isn't sure how many days it was but it was while he was in the single cell or drunk tank. *Id.* Once he was back in population he started getting supplies again. *Id.* at pages 61-62.

He also testified he was told he couldn't eat anything for three or four days. *Plff's Ex.* 1 at page 59. A trustee, named Bruce Hamilton would sneak him in Ramen noodle soup twice a day. *Id.* Defendants were sending him whole trays of food that Hicks testified he couldn't do anything but look at. *Id.* He indicated he couldn't bite it or anything. *Id. But see Defts' Ex.* 7 (special meals 1/7/2006 to 1/7/2006); Doc. 64 at page 11 (Admit plaintiff received special meals January 3-7, 2006).

He was able to submit a grievance while in the segregation cell. *Plff's Ex.* 1 at page 62. Specifically, on December 31st Hicks submitted a grievance. *Defts' Ex.* 4 at page 1. He stated that while at the police station he was handcuffed and hit in the belly and head. *Id.* Once at the jail he stated he was beaten and his mouth injured. *Id.* He stated Norwood hit him in the mouth with a shocking device. *Id.* He indicated he needed to be seen by a dentist. *Id.*

In response, Hicks was told Dr. Dietrich's office had been called to make an appointment but no one was there. *Defts' Ex.* 4 at page 1. He was told an appointment would be made as soon as the dentist opened. *Id.* He was also told the request had been sent to Chief Strickland. *Id.*

On January 3rd Investigator Clinton Russell interviewed inmate Carl Jerome Tate. *Defts' Ex.* 5. Tate stated he heard Hicks cursing Norwood (who Hicks calls lieutenant) and threaten to kill Norwood's family. *Id.*

Dr. Fred Dietrich testified he has a general dental practice in Camden, Arkansas. *Plff's Ex.* 5 at page 5. He occasionally treats detainees for the Ouachita County Sheriff's Department. *Id.* He testified it was perhaps once a month that he treated a detainee. *Id.* Most of the time it is for extractions. *Id.* Very rarely have the extractions been the result of some type of trauma. *Id.* at page

6.

Dr. Dietrich's records indicate he first saw Hicks on January 3, 2006. *Plff's Ex.* 5 at page 7. Dr. Dietrich looked at the x-ray and saw there were quite a few loose teeth and there was no other treatment indicated except extraction. *Id.* at page 9. The x-rays revealed that the teeth and some of the alveolar bone was mobile and loose and there was not much hope of saving them. *Id.* at page 10. There were a few teeth that might heal. *Id.*

Dr. Dietrich indicated tooth 21 was extracted because it was very mobile and the bone around it was mobile. *Plff's Ex.* 5 at page 11. He also extracted tooth 22, 23, 24, 25, 8, 9, 10, 11 for the same reasons. *Id.* at pages 11-17. He had to do some trimming of the upper and lower bone. *Id.* at pages 14-16. The x-ray also showed fractures of some bone in the upper and lower area. *Id.* at page 15. Dr. Dietrich indicated this could have occurred during a fistfight or falling and hitting a corner of something on the floor or near the floor. *Id.* at page 16. There is no mention in Dr. Dietrich's records about the teeth being loose or mobile. *Id.* at page 27.

Following the extractions on January 3rd, Dr. Dietrich prescribed Hicks Lorcet 10/650 which is a strong pain pill. *Plff's Ex.* 5 at page 19. He prescribed this because of the multiple extractions and bone trims. *Id.* He prescribed twelve at the time. *Id.*

Dr. Dietrich saw Hicks on January 6th to take out the sutures. *Plff's Ex.* 5 at page 20. When Hicks came in on January 6th Dr. Dietrich also extracted tooth number 20. *Plff's Ex.* 5 at page 20. The tooth had inflammation of the nerve of the tooth and was causing pain. *Id.* at pages 17 & 20. Dr. Dietrich again prescribed ten of the Lorcet 10/650s. *Id.* at page 21.

On February 13th, Dr. Dietrich removed tooth 15. *Plff's Ex.* 5 at page 22. The tooth was causing pain but Dr. Dietrich was not sure of the origin of the pain. *Id.* He does not recall if the tooth

was loose from the bone.  *Id.*

When asked, Dr. Dietrich stated it would have helped Hicks' chewing to have had the teeth replaced.  *Plff's Ex.* 5 at page 25.  However, he made no recommendations to Hicks or anyone at the Ouachita County Sheriff's Office regarding dentures, partials, or anything of that sort.  *Id.* at page 27-28.

Hicks received special meals from January 3rd to January 7th.  *Defts' Ex.* 7.  On January 4th an affidavit of probable cause was submitted to charge Hicks with two counts of terroristic threatening and aggravated assault on a correctional officer in connection with his conduct on December 30th with respect to Norwood.  *Defts' Ex.* 1 at page 2.  He had his first appearance on these charges on January 4th.  *Defts' Ex.* 2 at page 2.

Hicks, however, testified he plead guilty to two counts of terroristic threatening—one on Wells and one on Felicia Runyon the individual he had been accused of raping.  *Plff's Ex.* 1 at page 74.  He received a sentence of thirty months on the terroristic threatening charges.  *Id.* at pages 42 & 73.  The assault charge was dropped.  *Id.* at page 42.

On January 8th Hicks submitted a grievance stating that on December 30th Norwood had hit him in the mouth busting his upper and lower lip and knocking out about twelve of his teeth.  *Defts' Ex.* 4 at page 2.  Hicks stated Norwood hit him with a "black long iron shocking device."  *Id.*

On January 13th Hicks submitted a grievance.  *Defts' Ex.* 4 at page 5.  He stated he had been in pain every since he had been beaten by Norwood in the mouth with an iron shocking device.  *Id.* He stated he had pain pills but most of the time the staff refused to give him the medication.  *Id.* When he asked for the medication or beat on the bars to get someone to bring him the medication, he stated they threatened to beat him or put him back in the hole.  *Id.*  He asked to be moved to

another jail or the staff be controlled.  *Id.*

On January 13th, Joe Strickland, the Chief Deputy, sent Hicks responses to his grievances dated January 8th and January 13th concerning his allegations of abuse by Norwood.  *Defts' Ex.* 2 at page 13.  He stated he was investigating Hicks' allegations and at the conclusion of his investigation he would "forward you a response of my findings."  *Id.*

On January 25th, Strickland sent Hicks a written grievance response about his complaint against Norwood.  *Defts' Ex.* 2 at page 13.  He indicated an investigation had been conducted during which other law enforcement officers and inmates were interviewed.  *Id.*  Strickland found Hicks' complaints to be unsubstantiated.  *Id.*  He stated the evidence indicated Hicks was unruly, uncooperative and assaulted Norwood.  *Id.*

On February 8th Hicks submitted a grievance stating that he had asked a number of times to be taken back to the dentist because of tooth pain.  *Defts' Ex.* 4 at page 6.  He stated he was hit in the mouth by Norwood who broke out at least ten teeth.  *Id.*  Since January 21st Hicks stated he had been having problems with his teeth.  *Id.*  He indicated he could not eat properly.  *Id.*  He stated he had put in three medical requests with no results.  *Id.*

On some unspecified date in February, Hicks testified Norwood came to his cell and he asked him for his medication.  *Plff's Ex.* 1 at page 57.  Norwood said he was going to get Hicks' medication for him.  *Id.* at page 56-57.  However, Hicks said he never did get it.  *Id.* at page 57.

In response, Hicks was told this was the first request that jail staff had received or had

knowledge of. *Defts' Ex.* 4 at page 6. He was told that his request had been directed to Norwood and he would get him an appointment as soon as possible. *Id.*

On January 16th Hicks submitted a grievance in which he stated he went to the dentist on February 15th and had a tooth pulled. *Defts' Ex.* 4 at page 7. When Hicks came back to the jail, he stated he got nothing for the pain. *Id.* He also said he needed dental plates to eat his food properly. *Id.* He indicated he was going to write "Seven on Your Side" or someone and expose these conditions. *Id.*

In response, Hicks was told he had been taken to the dentist and his diet had been changed to meet his needs. *Defts' Ex.* 4 at page 7. He was told he kept threatening to write radio and television stations. *Id.* He was also told that was his legal right to do so, if he wished. *Id.*

On February 24th Hicks submitted a grievance asking for medical help. *Defts' Ex.* 4 at page 8. He asked why he had not been provided with dental plates so that he could eat his food properly. *Id.* He stated that most of the time he had to give his food away because he could not chew it. *Id.*

Hicks submitted another medical request because he believed some portion of the tooth [or root] was left in the gum after his tooth was pulled. *Defts' Ex.* 6. He also said one tooth that had been broken in half when Norwood hit him in the mouth was now causing him "real bad" pain. *Id.*

Hicks was released to the Arkansas Department of Correction (ADC) on March 1, 2006. *Defts' Ex.* 1 at page 3. His initial intake physical examination was performed on March 8th. *Defts' Ex.* 8 at page 2. His mouth was noted to be normal. *Id.*

His health classification and restriction report dated March 8th noted with respect to his dental care needs that elective treatment was needed. *Defts' Ex.* 8 at page 8. He was not placed on any special diet because of his teeth. *Id.* at page 12.

Since he has been at the ADC, he has been made dentures.  *Plff's Ex.* 1 at page 69; *Plff's Ex.* 6 at pages 1 & 16.  However, he testified when he eats he has to take them out.  *Plff's Ex.* 1 at page 69.  The bottom ones hurt so bad.  *Id.*  When eating he takes out the top ones also or he ends up biting his tongue and they come out of his mouth.  *Id.*  He testified he can hardly wear them.  *Id.*

## II.  Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."  *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a . . . verdict in their favor."  *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment."  *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III.  The Arguments of the Parties

Defendants argue first that there is no proof that Norwood used excessive force against Hicks. They maintain Norwood's actions were reasonable in light of the facts and circumstances confronting

-14-

him.  Moreover, they assert Hicks' injuries were sustained when he inadvertently hit the fingerprint table when he was being taken to the ground.  Second, they maintain there is no evidence of failure to intervene on the part of Baker and Gregory.  Finally, Defendants maintain Hicks has failed to allege an unconstitutional county policy which was the moving force behind the alleged constitutional violations.

Hicks maintains there is a genuine issue of material fact as to whether Norwood used excessive force against him in employing physical force against Hicks when he, although cursing, was not resisting or failing to obey any lawful orders given to him.  Instead, Hicks asserts he was merely trying to explain that the uniform he was given was too small.  Next, Hicks maintains there are genuine issues of material fact as to whether Baker and Gregory violated Hicks' constitutional rights when they failed to intervene when they witnessed Norwood's application of physical force.

Hicks provides contradictory statements on whether or not he wishes to proceed on his official capacity claims.  In one document he filed, he concedes the official capacity claims against Defendants should be dismissed.  Doc. 62 at page 1, ¶ 4.  In another, he argues his official capacity claims should be allowed to proceed because Baker testified that he has never received any training about when to intervene if a fellow officer is using excessive force.  Doc. 63 at page 2.

## IV.  Discussion

As noted above, Defendants have moved for summary judgment on both of Hicks' claims. I will discuss each claim in turn.

### *Excessive Force*

In this case, Hicks was a pre-trial detainee.  In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

[u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.   As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

The courts generally analyze excessive force claims of pretrial detainees in the same way as those of arrestees. *Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001)("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard."). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

In this case, Hicks testified he was just sitting there and Norwood came up and slapped him across the face. *Plff's Ex.* 1 at page 19. *See also Plff's Ex.* 7 (Affidavit of Eddie Bunn). Hicks maintains Norwood then struck him with an iron flashlight or other device knocking him unconscious. *Id.* When Hicks came to, he states Norwood was steadily kicking and stomping him. *Plff's Ex.* 1 at page 19. He asserts nine teeth were knocked out in the process and he sustained cuts to his mouth and lip. *Plff's Ex.* 1 at pages 34-35; *Defts' Ex.* 3. Hicks testimony regarding the slap

across the face is supported by the affidavit of Eddie Bunn. *Plff's Ex.* 7. Clearly Hicks suffered

injury; he was treated at the hospital that evening and by the dentist several days later. He had to

have sutures, multiple teeth extracted, and bone trimming. *Plff's Ex.* 5 at pages 11-17.

In contrast, Defendants maintain Hicks made an aggressive move by jumping up towards

Norwood a second time after he was once pushed back down onto the bench. They deny Norwood

slapped him in the face instead contending he used an arm bar maneuver in an effort to take Hicks

to the floor. While Defendants concede Hicks was injured, they maintain the injuries were

accidentally sustained when Hicks hit the fingerprint table with his mouth.

Given the contradictory versions of what occurred, I believe there are clearly genuine issues

of material fact as to whether Norwood used excessive force. To hold otherwise would require me

to adopt the version of the events as set forth by the Defendants over that of the Plaintiff. This I

cannot do at the summary judgment stage.

### Failure to Intervene

A detention officer may be liable for failure to protect an inmate from a use of excessive force

if the officer is deliberately indifferent to a substantial risk of serious harm to the inmate. *See e.g.,*

*Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1395 (8th Cir. 1997)(*citing Buckner v. Hollins,*

983 F.2d 119, 122 (8th Cir. 1993)(duty to intervene when excessive force is being used against an

inmate and the inmate claims injury, or aggravation of injury, due to the officer's failure to act)).

In response to a summary judgment motion, the plaintiff must show some evidence upon which a

trier of fact "could conclude that [the officer] acted with deliberate indifference to [the plaintiff's]

safety by failing to intervene in the altercation." *Buckner*, 983 F.2d at 122.

As noted above, given the contradictory versions of what occurred, I believe there are genuine issues of material fact that preclude summary judgment in Defendants' favor. Defendants' motion requires the Court to accept their version of the events and disbelieve the Plaintiff's this I cannot do at the summary judgment stage.

### *Official Capacity Claims*

"Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Grayson v. Ross*, 454 F.3d 802, 810-811 (8th Cir. 2006). "To establish the existence of a policy, [Hicks] must point to a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Jenkins v. County of Hennepin, Minn.*, 557 F.3d 628, 633 (8th Cir. 2009)(internal quotation marks and citation omitted). "[A] custom can be shown only by adducing evidence of a continuing, widespread, persistent pattern of unconstitutional misconduct. A plaintiff must also show either that policymakers were deliberately indifferent to the misconduct or that they tacitly authorized it." *Id.* at 634 (internal quotation marks and citation omitted). A single act cannot constitute an unconstitutional custom. *Id.*

In this case, Hicks does not point "to any officially accepted guiding principle or procedure that was constitutionally inadequate." *Jenkins*, 557 F.3d at 633. Instead, he maintains Baker was never trained on when to intervene if he believed another officer was using excessive force. Doc. 63 at page 9. "Liability for failure to train arises only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Grayson*, 454 F.3d

at 811 (internal quotation marks omitted)(*citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1988)). Both Baker, *Plff's Ex.* 3 at pages 5-6, and Gregory, *Plff's Ex.* 4 at pages 6, received law enforcement and/or jail standards training which included training in the use of force continuum. Hicks has submitted no evidence suggesting that the training they received was in anyway deficient or that there was any kind of causal link between the training received and their alleged failure to intervene in response to Norwood's alleged use of excessive force. There is simply nothing on which to base an official capacity claim.

### V. Conclusion

I therefore recommend that the Motion for Summary Judgment (Doc. 29) be granted in part and denied in part. Specifically, I recommend that the official capacity claims be dismissed. In all other respects, I recommend the Motion be denied.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of August 2009.

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE