IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

ANTHONY HICKS                                                                 PLAINTIFF

                         v.                        Civil No. 1:06-cv-01086

DAVID NORWOOD, Captain,
Ouachita County Jail; LT. GREGORY
Ouachita County Jail; and
SGT. BAKER, Ouachita County Jail                                  DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Anthony Hicks (hereinafter Hicks) filed this civil rights action under 42 U.S.C. § 1983. Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2007), the Honorable Harry F. Barnes, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

Hicks, currently in custody of the Arkansas Department of Correction (ADC), contends his constitutional rights were violated while he was incarcerated at the Ouachita County Detention Center (OCDC) in Camden, Arkansas.  Specifically, on December 30, 2005, Hicks contends excessive force was used against him by Captain David Norwood (hereinafter Norwood).  Further, he maintains Lieutenant Cedric Gregory (hereinafter Gregory) and Sergeant David Baker (hereinafter Baker), although present at the time, did nothing to prevent the use of excessive force.

On April 21, 2010, an evidentiary hearing was held.  At the conclusion of the hearing, counsel were given thirty days to submit proposed findings of fact and conclusions of law.  Both sides have submitted proposed findings and the case is before me for issuance of this report and recommendation.

## I.  Background & Evidence Presented

On December 30, 2005, Hicks was arrested by Officer Ferguson of the Camden Police Department.  Hicks was initially taken to the Camden Police Department where he had an altercation with Camden Police Officer Scott Wells.  Hicks was then taken to the OCDC to be booked in.  Baker was the intake officer.  During the intake process, Hicks refused to provide Baker with current information to confirm the accuracy of computerized records.

After Hicks' refusal to cooperate, he was directed to change into a jail uniform.  Hicks refused because he did not believe the clothing provided was large enough for him.  At this point, Norwood came into the booking area and an altercation occurred.  Two issues are before me for resolution: First, whether Norwood used excessive force against Hicks; and Second, whether Gregory and Baker exhibited deliberate indifference to Hicks' safety when they failed to intervene in Norwood's use of physical force.

At the evidentiary hearing, the following witnesses testified:  (1) Cale Cain; (2) Eddie Bunn; (3) Phillip McDaniel; (4) David Baker, a named Defendant; (5) Cedric Gregory, a named Defendant; (6) David Norwood, a named Defendant; (7) Anthony Hicks, the Plaintiff; and (8) Scott Wells.  The parties also submitted the testimony of Dr. Frederick Dietrich by deposition.  For purposes of discussion, the testimony of the witnesses will be summarized in the first person.

### *Cale Cain*

I am currently in the custody of the ADC.  I know Hicks.  I was in the OCDC in November and December of 2005.  Hicks was a detainee in the OCDC at the same time.

I was a trustee.  I worked outside on a trash detail.  I was on my way to the trustee living area when I saw Hicks, Norwood, and a jailer.  Hicks was on the bench in the booking area and Norwood

and the jailer were three to four feet in front of him.  The fingerprint table was right next to the bench Hicks was on.  I did not hear anything while Hicks was sitting there.  I did not see Hicks and Norwood confront each other or Hicks go from the bench to the floor.   I heard a commotion and stuck my head back in and Hicks was on the floor lying on his left side facing away from me.  His upper body, chest and head, was right next to the table.   He had one arm under him and it looked like they were trying to get his other arm behind him and cuff him.  One of them kneeled down.  I couldn't see Hicks' face.

There was only forty-five seconds to a minute between when I first saw Hicks and the commotion.  I didn't hear anyone say anything.  To my knowledge, Norwood didn't have anything in his hands.  The officer told me to go back into the trustee area and I did it.  I didn't see Hicks again until I saw him at the Diagnostic Unit of the ADC.

*Eddie Bunn*

I am currently incarcerated in the ADC.  I was in the OCDC for five or six months in 2005.  Hicks was also a detainee there.  I knew Hicks prior to his incarceration at the OCDC.

I saw the confrontation between Hicks and Norwood.  Four or five of us were coming in from work one day; We were on the trash detail.  Plaintiff's Exhibit 1 shows the area Hicks was in.  The elevator is where the open doorway is.  When I came upstairs, Hicks was on the bench complaining about the size of his jail uniform.  The doorway I was standing in is not shown on Plaintiff's Exhibit 1.

Baker called Norwood.  Norwood came and was standing with his back to the door shown on Plaintiff's Exhibit 1.  Baker and Norwood were in the room.  I don't remember Gregory being there.  Baker was telling Norwood they had a problem with Hicks wanting big clothes.  Hicks and Norwood

exchanged words; I do not recall exactly what was said but Norwood did not say much.  I do not recall Hicks giving commands.  Norwood slapped Hicks with his open right hand.  Hicks was still on the bench after the slap.  More words were exchanged but I do not recall what was said other than I heard Hicks say:  "You had hit the wrong one."

There was three or four feet between me and the door.  Cale was behind me but still inside the room.  After Norwood slapped Hicks, he told us to get into the trustee pod.  I was in the process of going into the pod when I heard a nosie that sounded like a blow.  I turned around and saw Hicks on the floor and Norwood had a taser in his hand and was shocking Hicks.  It looked like a black rod. Norwood shocked Hicks in the torso area once, pulled the taser off, and then shocked him again.  I watched for about a minute and Norwood shocked Hicks three or four times.  I didn't see any hitting, punching, or kicking.  I did not see Norwood hit Hicks with the device he was holding.

Hicks was on the floor on his side shaking from being shocked.  I do not believe he was handcuffed.  His eyes were closed and he was balled up in a fetal position like he was hurting.  I did not see Hicks hit anything with his body.  He was about six or seven feet from the fingerprint table.

Norwood told us to go back in the pod and shut the door.  We did.  You could see the room from the trustees pod because there was a glass window.  No one from the Sheriff's Department came and talked to me about what happened.

I saw Hicks about two or three days later.  I noticed his mouth looked like it was all busted up.  Pieces of tooth came out when he tried to eat.  He couldn't chew any food because of the condition of his mouth.  His teeth were ruined, jagged looking, like he had been hit or something. His lip was "fat."

In October of 2007, Hicks and I were both at the Tucker Unit of the ADC.  Hicks told me he was trying to get into court.  I wrote up an affidavit on October 11, 2007.  Defendants' Exhibits 4 and

5 are the same affidavit; I just ran out of room on the one page, Defendants' Exhibit 4, and continued it on another page, Defendants' Exhibit 5.  I stated in the affidavit that I had left the room and was looking through a glass door.  Defendants' Exhibit 5 says that Norwood kicked Hicks.  Today I do not remember that.  I've had no more than ten conversations with Hicks about the case.  In 2007 the incident was fresh in my mind.

**Phillip McDaniel**

I am currently incarcerated in the ADC.  I was arrested and booked into the OCDC on November 23, 2005.  I remained there until March 1, 2006.

On December 30, 2005, I was in "cell two back."  To shower, I had to go to "cell two front." I heard something that sounded like a "lick."  I ran down the hallway from 2 front it comes right into the room depicted on Plaintiff's Exhibit 1.  The door I was at is not shown on Plaintiff's Exhibit 1. The door was closed but it has a big window and you can see the room clearly.  Some trustees came out of their door, Cain, Bunn, and a few others.  Cain was standing in front of the door I was behind. Cain and Bunn took a step out of their door.

I did not seen any physical conduct between Norwood, Baker, and Hicks.  When I got there, Hicks was already down on the floor in front of the bench. He said he had been hit in the mouth and all his teeth were out.  He said they put hands on him.  He was bleeding.  He was laying down crying because he was hurting.  He laid there a good five minutes.

Norwood and Baker were in the room.  Norwood was closer to the fingerprint table facing Hicks.  Hicks needed assistance getting off the floor.  He was taken straight to the drunk tank. Through a vent, I could hear him beating and kicking on the door because he was hurting and wanted medical treatment.

For days, Hicks had bits and pieces of teeth coming out of his mouth.  He could not eat.  He

was trying to get a request form for medical treatment. They wouldn't take him for treatment. No one asked me what occurred on December 30, 2005.

I was in the cell with Hicks and we talked. Hicks had been to the dentist before we were cell-mates. I have seen jailers walking around with flashlights during the day and at night.

**David Baker**

I worked at the Ouachita County Sheriff's Department from October of 2002 until the first week in June 2006. I started as a jailer and worked my way up to sergeant of the jail. On December 30, 2005, I was a sergeant. I had taken the jail standards certification course in Texas and it transferred to Arkansas. The course covered the use of force, applicable constitutional amendments, and what to do if you saw an officer go completely overboard. If that happens, you are supposed to step in and back the officer off. I have never had to do that.

When I started at the OCDC, I reviewed the use of force policy. *See Plaintiff's Exhibit* 3. It is a pretty standard use of force policy. Basically the policy is to use the minimum amount of force necessary to protect your own safety and the safety of others. In 2005, we utilized verbal commands and physical force; We did not have any tasers or pepper spray in the jail. After every incident in the jail, we would go back over the different steps regarding the use of physical force. When a detainee is just cursing or talking in a loud voice, there is no justification for the use of force.

I was on duty on December 30, 2005. The Camden Police Department brought Hicks in. They gave me their booking sheet of the charges against him. During the booking process, Hicks sat across from me. We had hardly started, when Hicks said I knew him and we had the information in the computer. There was information on Hicks stored on the computer. I retrieved the information once I was able to get his social security number. I had to make sure the information stored in the computer is not different from the current information. Hicks wouldn't answer my questions. I made

-6-

a number of attempts.  I told him we would finish the booking later after he calmed down.

I had Hicks go to the bench and told him to dress in jail clothes.  When he went to the bench, he was just verbally abusing me and was not aggressive.  The bench was six or seven feet away from me.  He didn't start to undress right away.  But, at some point, he took his shoes and pants off.  He had a t-shirt, boxer, and socks on.  I was in the process of getting him clothes.  He didn't want anything tight.  All we had was a 5x pair of black and white striped pants or a 2x pair of orange pants.  I gave him the 2x pair.  I knew a 2x pair was big enough for me.  I think he tried to get one leg in.  He said they were too small and he wasn't going to attempt to put them on.  He refused the 5x pants because they were not the right color.  He wanted orange pants but in a bigger size.  I told him I thought all we had were the 2x.

He sat back down on the bench and kept right on with the verbal abuse.  I told him we needed to get clothes on him and get him upstairs.

Somewhere in there, Norwood came up.  I did not send for Norwood.  I did not ask for any assistance in booking Hicks in.  If someone is yelling like Hicks was, you can hear that throughout other areas of the jail.  If someone is just talking in a normal tone of voice, you cannot hear their conversation in other areas.  When Norwood came in, I relinquished command.

The room we were in is called the fingerprint room.  When Norwood came in, Hicks was on the bench.  Hicks switched from "hollering" at me to "hollering" at Norwood.  There was about six inches between Hicks and Norwood.  Hicks jumped up from the bench toward Norwood and may have touched Norwood.  Hicks was being hostile and aggressive when he jumped up off the bench.  He didn't just stand up.  He jumped towards Norwood and was pushed down.  Norwood had not given Hicks any verbal commands.  Norwood did not slap Hicks.  There was nothing in Norwood's hand.

-7-

Norwood asked me what all the hollering was about.  I told him Hicks did not want to dress out because he wanted a larger size pants.   The 5x black and white pants were on the fingerprint table.  The orange 2x pants were on top of Hicks' jeans.  I think Norwood picked up the orange pants and offered them to Hicks again.  Hicks came right back off the bench still using vulgar language, cursing, and saying something like: "You did this to the wrong one."  His body language was the threat.  He was off the bench and going towards Norwood.  Norwood used an arm lock maneuver on Hicks.  The object of the maneuver is to take the inmate to the ground. Norwood grabbed Hicks' left wrist, pulled it up to lock his elbow, and using Hicks' own momentum, spun him around to take him to the floor.  At this point, Hicks did not have a lot of momentum because his socks were slipping on the floor.  It has been waxed within a week.

After he was spun around, Hicks was facing the fingerprint table.  He lost his balance and his head and upper body hit the fingerprint table.  I am guessing Hicks would have hit the top and middle shelves.

I did not step in when Norwood took Hicks down.  I did not consider the use of the maneuver to be inappropriate.   Even if I thought the maneuver was inappropriate, there was no time to intervene. I was on the other side of the fingerprint table and the time lapse between Hicks' jumping off the bench was probably only five seconds.   Hicks had jumped towards Norwood in a hostile and aggressive manner.  This justified Norwood's use of whatever force was necessary to control Hicks. Hicks was pushed down to the bench, an arm bar was used, and Hicks was placed in handcuffs.  This was all the force used.  The only injury was to Hicks' mouth.

I did an incident report.  It is Plaintiff's Exhibit 4.  We are required to do a report of any incident involving the use of force.  My report is accurate except for the fact there is a missing sentence or two.  After I proof read it, I tried to add a sentence before I gave it to anyone.  I thought

I had added it but for some reason I left out of my report the fact that Hicks jumped off the bench a second time. When I printed my report out again, I saw that it did not have my edits.

   *Cedric Gregory*

   I have worked at the Ouachita County Sheriff's Department for ten years. I was on duty on December 30, 2005, and present during the incident with Hicks.

   I was asked to report to the jail by Baker to stand by while Hicks dressed out. I went from the deputies' office to the upstairs. I was standing by the desk while Baker attempted to book Hicks. Hicks was yelling the entire time. Baker repeatedly asked Hicks to answer questions.

   Eventually, Baker told Hicks to sit on the bench in the fingerprint area and remove his clothing. Hicks complied. Baker gave Hicks a pair of trousers. Hicks stuck his feet in the trousers and said they were too small.

   When Norwood came upstairs, I was standing in the doorway to the jailers' office about five or six feet behind him. Hicks was in front of Norwood and slightly to the left. Baker was standing by the closet on the other side of the room. He was to my right but not directly in front of me.

   Norwood asked Baker what the problem was and Baker replied that Hicks was refusing to get dressed. Norwood asked Hicks to get dressed. Hicks, who was seated at this time, replied that he was not going to put the trousers on because they were too small. Norwood talked to Hicks for just a few seconds and Hicks threw the uniform trousers and started putting on his own pants. Norwood took the jeans from Hicks and said he couldn't put them on. Hicks jumped up and Norwood using his left hand on Hicks' shoulder sat him back down. Hicks jumped back up again and Norwood pushed him away. Hicks feet started slipped on the floor and he ended up over by the fingerprint table.

   I could only see Norwood's one hand. I didn't see Norwood slap Hicks, the use of the arm

bar maneuver, or Hicks' twirling around.  I didn't have the same vantage point as Baker.  I just saw Norwood push Hicks back; Hicks' feet began to slip; He began to fall and ended up by the table. Hicks tried to regain his balance.  Hick's jumping into Norwood's face was aggressive.  You could tell from Hicks' posture and manner.

Norwood did not have any implement, flashlight, or shocking device in his hand.  Norwood would have been in control of where Hicks went.  I felt the use of force was appropriate after Hicks jumped up the second time.  Even if I felt it was inappropriate, there was no time to intervene it happened too fast.

Hicks continued to yell after he hit the table.  He threatened to kill everyone. I only saw injuries to Hicks' mouth.  He never complained of any injuries to me.

*David Norwood*

I am currently the Sheriff.  On December 30, 2005, I was the jail captain, or administrator. I oversaw everyday operations.  In 2005, we didn't have any type of tasers.  After 2006 or 2007, the officers carried tasers.  There is a stun shield that is about three feet tall and wraps around.  It has two handles and is made of clear plastic.  It is inoperable.  The flashlights are eight to ten inches long, made of black aluminum, run on C or D batteries, and are kept in the booking room.

I went to the jail on December 30, 2005, because there was a disturbance in the jail-- screaming and yelling.  Hicks was sitting on the bench wearing a t-shirt, underwear, and socks when I got upstairs.  When I walked in, we were close--within an arm's length of each other.  He was trying to put on his street clothes.  I told him he could not wear the street clothes and it was the jail uniform or nothing.  Hicks jumped up and I pushed him back down.  I did not slap Hicks.

When Hicks got up the second time, there was contact between his chest and me.  I felt he was being very aggressive.  He jumped in my face yelling and screaming.  He didn't just get up from the

-10-

bench.  I was concerned he was going to act on his aggression but I was not intimidated.  He is smaller than I am.  I took his left arm to push him back and to take him to the ground.  I tried to use the arm bar maneuver to get him to the floor and control the momentum of where he was going to land.  My intent was to get him to the floor in the open area between the fingerprint table and the wall.  If used properly, the detainee has no control over his movements.  However, the technique did not work the way it is supposed to.  Hicks either slipped or pulled away and I couldn't direct where he was going to land.  I didn't have an opportunity to do anything.  I did not shock Hicks or use any type of an implement against him.

When he jumped up, I hadn't decided to handcuff him.  In fact, I didn't have handcuffs and had to ask someone for them.  Hicks' mouth was injured.  He complained of no other injuries.  After Hicks' mouth was injured, he made verbal threats to kill me and my family.  He also threatened jail employees.  Hicks put on the black and white pants he refused previously and was taken to the hospital.

I don't use physical force for just a verbal assault.  Hicks was right in my face.  He never laid a hand on me.  However, anytime a detainee gets within an arm's length it is an act of aggression.  It is especially true with Hicks' history.

### Anthony Hicks

I am currently incarcerated at the ADC.  I was arrested on December 30, 2005, by the Camden Police.  At the police department, Officer Scott Wells put me in handcuffs and then hit me in the stomach, punched me in the back of the head, and threw me against the wall.  I was not intoxicated; I only had one beer that day.  My current incarceration is the result of a terroristic threatening charge in connection with my altercation with Wells.  I also plead guilty to second degree battery but was sentenced to time served.

-11-

Around 3:30 or 4:00 p.m., I was taken to the OCDC and encountered Baker in the booking office. I was at his desk. I was not cooperating because it had not been too long since I was in jail so Baker had the information.

Baker told me to go to the bench and undress. He brought me a shirt but the pants were just a size large. He did not give me any black and white pants. I was just talking to Baker. I do not recall what we were talking about. I may have been talking loudly.

Norwood walked in and slapped me across the face with an open hand. I did not make any aggressive move toward anyone. I did not get up off the bench in his face. When I was trying to ask him why he slapped me, he struck me with some a black device or implement approximately one to two feet long, I lost consciousness. I fell straight down to the floor. I was three or four feet from the fingerprint table. I didn't get near it.

I do not know how many times Norwood hit and kicked me. I was unconscious. When I woke up I was on the floor. I heard a lot of noise. As I tried to get up, I felt something sticking to my hand and I realized it was my teeth. Blood was all over my shirt and the floor. Norwood was shocking me with something. I told him he was wrong.

Baker and Norwood sat me on the bench. Norwood told Baker to get me some pants that fit. I was given some orange pants. I dressed myself and then I was handcuffed. Norwood tried to say I was spitting on him but I was choking. I fell out of the door of the patrol car at the hospital and had to be wheeled in. I told them at the emergency room that Norwood knocked my teeth out and that I had been unconscious. I didn't go through all the details.

When I got back to the jail, I was put in the drunk tank for seven or eight days. I was taken to the dentist, Dr. Fred Dietrich. He pulled at least ten of my teeth, cut the gum open, and scrapped the bone out.

-12-

My top and bottom lips were injured, my bottom teeth folded under, and the top ones were shattered. The only injuries I suffered from the two assaults were to my mouth. If my side was injured, the pain in my mouth outweighed it.

**Scott Wells**

I work for the Camden Police Department. I came into contact with Hicks on December 30, 2005. Hicks was identified as a suspect in a rape case and was arrested on a warrant.

I took Hicks back into the interrogation room. Hicks became uncooperative when I started asking for the personal information.

**Dr. Fred Dietrich** (by deposition)

I have been engaged in the general practice of dentistry in Camden since 1964. Once a month at the most, I treat detainees that are in the OCDC. *Plaintiff's Exhibit* 7 at page 5. Most of the time when they bring someone over it is for extractions. *Id.* Very rarely, have I done dental extractions on detainees caused by some type of trauma to the tooth. *Id.* at page 6. By taking x-rays and examining the tooth, you can tell whether a trauma has occurred to the tooth. *Id.* You look to see if the tooth has been moved out of position. *Id.* You look at the appearance of the root compared to the anchoring bone and its general mobility. *Id.* at page 7.

I first saw Hicks on January 3, 2006. *Plaintiff's Exhibit* 7 at page 7. There was no significant periodontal disease. *Id.* at page 14. He had no other natural disease processes that would have caused his teeth to be in the condition they were in. *Id.* at page 21. The x-ray showed multiple fractured teeth with fractured alveolar process. *Id.* at page 28. This would indicate the teeth are loose. *Id.* There was no other treatment indicated except extraction. *Id.* at page 9. The x-rays showed that the teeth and some of the alveolar bone was mobile and loose and there were some fracture of the upper and lower area. *Id.* at page 10 & 15. The fractures could possibly have been from being in a fistfight

-13-

or falling and hitting a corner of something on or near the floor.  *Id.* at page 16.  The condition of his mouth would have caused pain.  *Id.* at page 18.

There were a few teeth that could possibly be saved.  *Id.* at page 10.  I couldn't determine how the teeth became loose.  *Id.* at page 12.  Hicks never indicated to me how his teeth became loose.  *Id.* at page 10.

On January 3rd, I extracted the following teeth:  21, 22, 23, 24, 25, 8, 9, 10, and 11.  *Plaintiff's Exhibit* 7 at page 17.  They were extracted because the teeth were mobile and the bone around them was loose.  *Id.*  I also did some trimming of the upper and lower bones.  *Id.* at pages 14-16.  I prescribed Lorcet, a strong pain medication, for a couple of days because of the multiple extractions and bone trims.  *Id.* at 19.  The prescription was for twelve tablets.  *Id.* at 19.  Hicks was told he would need to return for suture removal and to let us know if any bones started working through or if other teeth started causing problems.  *Id.* at pages 21-22.   It is routine with bone trims for loose fragments to later work through.  *Id.* at page 24.

I saw Hicks again on January 6th to take out the sutures.  *Plaintiff's Exhibit* 7 at page 20.  Hicks was healing fine but tooth #20 was causing him pain.  *Id.* at page 20.  We were hoping it would heal but the nerve of the tooth was inflamed.  *Id.* at page 17 & 20.  I extracted it and again prescribed pain medication--ten of the Lorcet 10/650s.  *Id.* at page 21.

On February 13th, we took out another tooth, #15.  *Plaintiff's Exhibit* 7 at page 22.  I don't recall if this tooth was loose from the bone or if it was decayed.  *Id.* at pages 22 & 27.  The x-ray does not contain a view of it.  *Id.*  This was the last time I saw Hicks.  *Id.* at page 25.  It is not my practice to make notations about the reason for the extractions.

I do not indicate on my records that any of the teeth were loose.  *Plaintiff's Exhibit* 7 at page 27.  I made no notation about that.  *Id.*

It would have helped Hicks' chewing to have the teeth replaced.  *Plaintiff's Exhibit* 7 at page 25.  I didn't make a recommendation to Hicks on any type of partial or on dentures.  *Id.*  I didn't take a full set of x-rays and you have to look at the mouth as a whole to be able to make a recommendation.  *Id.*

## II.  Discussion

As noted above, two separate claims are presented;  (1) an excessive force claim against Norwood; and (2) a failure to protect claim against Baker and Gregory.  Each claim will be addressed in turn.

### *Excessive Force*

Because [Hicks] was a pretrial detainee at the time of the alleged violation of his constitutional rights, we analyze [his] claim against [Norwood] under the Fourteenth Amendment, rather than the Eighth Amendment."  *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010).  In *Johnson-El v. Schoemehl,* the Eighth Circuit court noted that:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees].  *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979).  Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners.  *Id.*  The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.   As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment.  *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

*Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048 (8th Cir. 1989).

An objective reasonableness standard is used in analyzing the claims of pretrial detainees.

*Andrews v. Neer*, 253 F.3d 1052, 1060 (8th Cir. 2001).  The use of force must be necessary to some

legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *Schoemehl*, 878 F.2d at 1048. The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them. *See e.g., Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996).

Keeping these principles in mind, I turn to an examination of the evidence presented. Hicks denies he got up off the bench or made any aggressive move towards Norwood. Instead, Hicks testified Norwood just walked in and slapped him with an open hand across the face. When Hicks was asking Norwood why he slapped him, Hicks testified he was struck with some black device or implement and lost consciousness. Hicks does not know how his mouth was injured. However, Hicks maintains he was no where near the fingerprint table. Only one other witness testified that Norwood had an object in his hand. Specifically, Bunn testified Norwood had a taser and used it to shock Hicks three or for times. The other inmate witnesses, Cain and McDaniel, saw Hicks on the floor but did not witness any physical confrontation or see anything in Norwood's hand.

The OCDC witnesses, Baker, Gregory, and Norwood all testified Hicks was being hostile and aggressive when he jumped off the bench. Norwood denied he had anything in his hand and Baker and Gregory did not see anything in Norwood's hand. I find credible the testimony of Baker and Norwood that an arm bar maneuver was used to control Hicks. Gregory testified he had a different vantage point and did not see the maneuver used. However, he indicated Norwood simply attempted to push Hicks away each time he jumped up.

Clearly, the maneuver went wrong and Hicks' mouth was injured when he fell or slipped. I note that when Hicks was treated at the hospital, the only injuries mentioned, are lacerations to the

-16-

upper and lower lip.  *See Defendants' Exhibit* 1.  There is no mention in the records of a taser being

used, any injuries caused by the use of the taser, or of Norwood kicking Hicks.  *Defendants' Exhibit*

1.  Additionally, while the dental records indicate Hicks had multiple loose teeth as a result of the

trauma, nothing in the records or Dr. Dietrich's testimony indicates Hicks had any missing teeth.

*Plaintiff's Exhibit*  7 (records attached).  Had Hicks in fact lost teeth or had a taser used on him, I

believe Hicks would have reported this to the medical personnel treating him.

    In short, the credible evidence establishes the following:  Hicks was being non-compliant with

orders issued by Baker and was verbally abusing the officers; the verbal abuse was loud and could

be heard in other areas of the detention center; Hicks and Norwood were in close proximity to each

other;  when Hicks jumped off the bench towards Norwood it was reasonable for Norwood to believe

Hicks constituted a threat to his safety; Norwood attempted to utilize an arm bar maneuver to take

Hicks to the floor; Hicks lost his footing and fell hitting his mouth on the fingerprint table or the

bench; and Hicks suffered injuries to his mouth resulting in ten teeth being extracted and both the

upper and lower bone being trimmed.

    After careful consideration, I conclude that Norwood did not use excessive force against

Hicks.  The evidence establishes Norwood acted in a reasonable way in light of the circumstances.

### *Failure to Protect/Intervene*

    A detention officer may be liable for failure to protect an inmate from a use of excessive force

if the officer is deliberately indifferent to a substantial risk of serious harm to the inmate.  *See e.g.,*

*Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1395 (8th Cir. 1997)(*citing Buckner v. Hollins,*

983 F.2d 119, 122 (8th Cir. 1993)(duty to intervene when excessive force is being used against an

inmate and the inmate claims injury, or aggravation of injury, due to the officer's failure to act)).  To establish a failure to intervene claim, Hicks is required to show:  "(1) the officer observed or had reason to know that excessive force would be or was being used; and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Nance v. Sammis*, 586 F.3d 604, 612 (8th Cir. 2009)(*quoting Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)).

As noted above, I have concluded Norwood did not utilize excessive force against Hicks. Baker and Gregory therefore had no duty to intervene.  Furthermore, even if Baker and Gregory had a duty to intervene, the incident occurred so quickly that there was simply no time for either Baker or Gregory to intervene.   Under the circumstances, they cannot be held liable for a failure to intervene.

### III.  Conclusion

I therefore recommend that judgment be entered in favor of the Defendants and the case be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **25th** day of **June 2010.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE